**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | | |
|---|---|---|
| Jonathan L. Kingery, | ) | |
| | ) | Civil Action No. 4:10-CV-1448-MBS |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. PROCEDURAL HISTORY

On June 7, 2010 Plaintiff Jonathan Kingery filed the within action pursuant to 42 U.S.C. §

405(g) of the Social Security Act, as amended (the "Act") seeking judicial review of a final decision

of Defendant Commissioner of Social Security Administration (the "Commissioner") denying

Plaintiff's claim for Social Security disability insurance benefits ("DIB").  In accordance with 28

U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate

Judge Thomas E. Rogers, III for pretrial handling.  After receiving two extensions of time, Plaintiff

filed his brief addressing the substantive issues in this case on March 2, 2011.  ECF No. 16.  The

Commissioner sought an extension of time to respond, which was similarly granted, and

subsequently filed a Memorandum in support of its decision denying Plaintiff's claims on May 16,

2011.  ECF No. 23.  Plaintiff did not file a response to the Commissioner's Memorandum and, on

June 30, 2011, the Magistrate Judge issued a Report and Recommendation ("R&R") recommending

that the Commissioner's decision to deny Plaintiff's claims be affirmed.  ECF No. 29.  On July 18,

2011 Plaintiff filed objections to the R&R.  See Pl's Obj., ECF No. 31.  The Commissioner

responded to Plaintiff's objections on August 1, 2011.  ECF No. 34.

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this Court. Mathews v. Weber, 423 U.S. 261, 270 (1976). The Court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1). The Court is obligated to conduct a de novo review of every portion of the Magistrate Judge's report to which objections have been filed. Id. For the reasons set forth below, the Court reverses the Commissioner's decision and remands this matter for further administrative proceedings.

## II. FACTS

Plaintiff alleges that he became disabled to work on September 22, 2006 as the result of a motor vehicle accident that left him with multiple symptoms, including a lower back injury that he claims prevents him from standing, sitting, or walking for any length of time, "constant pain in his back and right leg, numbness in his right leg and both hands, limited mobility requiring the use of a cane to ambulate[,] and pain and limited mobility in his neck." Pl.'s Br. 4, ECF No. 16. Plaintiff filed his current application for DIB on April 30, 2007, alleging disability beginning on September 22, 2006. R. 109. Plaintiff's application was denied initially on July 10, 2007 and upon reconsideration on November 1, 2007. R. 65–69. Plaintiff requested a hearing and his case was assigned to Administrative Law Judge ("ALJ") Clinton C. Hicks. The ALJ held a de novo hearing on Plaintiff's application on April 29, 2009. R. 39–64. On June 18, 2009, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled within the meaning of the Act. R. 9–17. Plaintiff sought review of the ALJ's decision from the Appeals Council, which denied the request in a notice dated April 15, 2010. R. 1–3. Accordingly, the ALJ's decision became the

2

Commissioner's final decision for purposes of judicial review.

**A.    Plaintiff's Medical Records**

Plaintiff claims a traumatic onset of disability due to injuries suffered in a motor vehicle accident on September 22, 2006.  X-rays and a CT scan taken at the Emergency Room (the "ER") on the day of the accident revealed nothing unusual and Plaintiff was discharged that same day.  R. 192–193, 197.  At the ER, Plaintiff was given injections of Toradol, an anti-inflammatory, and hydromorphone, a pain reliever.  R. 190.  He was also prescribed  Soma, a muscle relaxant, as well as oxycodone and acetaminophen for pain.  R. 194.  At intake, Plaintiff reported his pain as "eight," but at the time of discharge he described it as "one" on a scale of one to ten.  R. 189, 197.

Two days later, Plaintiff returned to the ER, complaining of constipation and urinary difficulty in addition to back pain.  R. 199.  An X-ray of the lumbar spine revealed "a fleck . . . that may be a spur," but no acute pathology was observed.  Plaintiff's exam results were otherwise normal.  Id.  During the visit, Plaintiff reported his pain level as a "seven" or "eight."  R. 202. Plaintiff was given Toradol as well as Norflex, which helps to relieve pain and muscle stiffness, with good results.  R. 199.  The attending osteopathic physician also opined that some of Plaintiff's complaints may be the result of side-effects of the medication that Plaintiff had previously been prescribed "which may be too strong."  R. 200.  That physician prescribed Medrol and Vicodin for pain and inflammation and, at Plaintiff's request, provided him with an address for the neurosurgeon on call, Dr. William Hunter.  Id.  Plaintiff was discharged "with a lumber sprain/strain, possible herniated disk, to follow up with Dr. Hunter within the next 1–3 days."  Id.

On September 26, 2006 Plaintiff had an initial neurosurgical consultation with Dr. Hunter at which he presented with complaints of "neck pain, shoulder pain, arm pain, numbness, tingling

and burning sensation as well as lower back pain, hip pain, buttock pain and leg pain." R. 225. On a pain scale of one to ten, Plaintiff estimated his pain at six to eight. Id. Dr. Hunter noted that X-rays of Plaintiff's lumbar spine performed in the ER on the day of the motor vehicle accident "show[ed] questionable fracture in the area of L4." R. 226. Per Dr. Hunter's recommendation, on October 7, 2006, Plaintiff had an MRI of both his cervical and lumber spine and flexion-extension films taken of the same area. R. 217, 226. The MRI of Plaintiff's lumbar spine revealed "sizeable right disc herniation compressing right S1 nerve root," "severe disc desiccation and flattening L5-S1," and "minimal disc bulge L4-5." R. 219. The MRI of Plaintiff's cervical spine found "mild disc dissection and bulging C3-4 through C6-7 causing no stenosis." R. 221.

On November 1, 2006 Dr. Hunter gave Plaintiff an epidural steroid injection to treat his complaints of "severe low back pain extending into both legs[.]" R. 215. After the procedure, Plaintiff was given Demerol for pain relief. Id. On November 21, 2006 Plaintiff saw Dr. Hunter again, reporting that, despite the epidural steroid injections, "[h]is pain has progressively worsened." R. 271. Dr. Hunter noted that Plaintiff "was in obvious discomfort during his examination." Id. Dr. Hunter recommended further evaluation and, depending on the results, possibly a surgical procedure called a "plasma disc decompression." Id.

On December 7, 2006 Plaintiff underwent a plasma disc decompression. R. 255. Dr. Steven Gudeman later explained in a letter dated April 18, 2007 that, "[b]ased upon clinical examination, past treatment, and diagnostic testing including MRI," Plaintiff was a candidate for this surgery, because he "had undergone and subsequently failed conservative treatment that included medication therapy, and steroid injections . . . [and h]e was having radicular symptoms as well as lower back pain that correlated to his [October 7, 2006] MRI . . . which revealed the abnormalities." Id.

4

On December 29, 2006 Plaintiff presented "with continued back pain with radiation into his right leg and was treated with oral steroids." R. 256. A re-evaluation of the MRI performed on October 7, 2006 "confirm[ed] the presence of a right lateralized disc bulge" and the examining physician opined that Plaintiff "may be a good candidate for a right microlumbar discectomy secondary to L-5/S1 disc bulge." R. 264. Plaintiff had the recommended lumbar microdisc surgery on February 7, 2007. R. 255.

On March 8, 2007 Plaintiff saw Dr. Gudeman for a status checkup. R. 261. Dr. Gudeman noted that Plaintiff continued to have "significant lumbar and right radicular pain" and recommended an MRI of the lumbar spine. Id. Plaintiff was also prescribed a Medrol dosepak, muscle relaxant, and analgesic. Dr. Gudeman further recommended that, "[i]f there should be no significant pathology present, I believe beginning aggressive physical therapy would be reasonable with return in four to five weeks." Id.

On March 13, 2007 Plaintiff returned to Dr. Gudeman "with a complaint of some right lower abdominal pain" that he traced to the disc decompression procedure. R. 260. His physical examination revealed nothing remarkable, but Dr. Guderman noted that Plaintiff was scheduled for an MRI of the lumbar spine and noted that, "because [Plaintiff's] discomfort began during a spinal procedure, will take a close look at that MRI to see if there has been any new abnormalities that may address his discomfort." Id. In the meantime, Plaintiff was taking pain medications, muscle relaxants, and a steroid. Id. On the following day, Plaintiff had an MRI of the lumbar spine as scheduled. Per Dr. Gudeman's notes, the MRI appeared to reveal nothing unremarkable. R. 257.

Dr. Gudeman saw Plaintiff again on April 12, 2007. Id. Dr. Gudeman noted that, following the operations discussed above, Plaintiff's pain went "from a 9 or 10 to now a 5 level." Id. Dr.

Gudeman described Plaintiff's post-operative condition as follows:

> Currently, he notes cervical stiffness, in addition to lumbar stiffness without actual cervical pain. The back and leg does have pain and is at a 5 level. The pain radiates down the anterior aspect of the leg and [Plaintiff] notes right calf numbness. There are no left-sided symptoms. Pre- or postoperatively, he has had no actual physical therapy or chiropractic management. . . . [Plaintiff] has had no cervical or lumber complaints prior to the accident of September 22, 2006. He was in a minor car accident eight years previously with complete resolution of any type of discomfort.

Id. Dr. Gudeman conducted an examination, noting that Plaintiff's "[r]ange of motion of the cervical spine is approximately 80%" and "[h]e is able to stand on heels and toes without difficulty." Id. Dr. Gudeman opined that Plaintiff "would benefit from three weeks of physical therapy to the neck and back followed by work conditioning of four weeks and a Functional Capacity Evaluation with return in eight to ten weeks for rating and releasing." Id.

Plaintiff began physical therapy on April 23, 2007. See R. 275. Listed as Plaintiff's "goal" on the initial evaluation plan was to "go back to work." Id. Plaintiff attended physical therapy sessions approximately three times per week until he was discharged to his physician on June 11, 2007. R. 279–83. Upon discharge, Plaintiff's prognosis was described as "poor." R. 283. On the same day, Plaintiff underwent a four-hour Functional Capacity Evaluation performed by a physical therapist. R. 276. Based on that evaluation, the physical therapist concluded that Plaintiff "is not able to work today." Id. The physical therapist explained that Plaintiff "passed 12/15 validity criteria indicating good effort and valid test results; therefore, his disability appears secondary to his medical impairment." Id. Dr. Gudeman saw Plaintiff on June 21, 2007, at which time he noted that:

> [Plaintiff] continues to have significant back pain rated at a 5 on the pain scale level. He underwent a work conditioning program of four weeks followed by a functional capacity evaluation . . . with a determination of a valid score and that he is medically disabled from all work activities including sedentary activities. It is my opinion that [Plaintiff] has reached maximum medical improvement and would give him a

6

> permanent partial impairment rating of 13% to the whole person and 24% to the
> spine, and that he indeed is considered medically disabled from any type of work
> activities, including sedentary activities. [Plaintiff] will be in need of chronic pain
> management on a long-term basis with no further neurosurgical follow up necessary.

R. 284.

On September 11, 2007 Dr. Benson Hecker reviewed Plaintiff's medical records and conducted an independent medical examination of Plaintiff, specifically for evaluation of Plaintiff's "vocational/training potential." R. 326. Dr. Hecker wrote that Plaintiff "stated that he experiences numbness in his fingers 75% of the time along with tingling sensation." R. 335. Plaintiff further advised Dr. Hecker that,

> he experiences constant back pain. Using a pain scale ranging from one (none/mild)
> to ten (severe), [Plaintiff] stated that his pain, with limited motion is in the 5–6 level
> (moderate). If he is required to sit, stand or walk for prolonged periods of time, if he
> turns/twists his spine, forward bends, is exposed to cold weather conditions or with
> any motion, his pain increases to 7–8 levels (moderately-severe). To help with his
> pain he is required to stop activities, change positions, take medication, recline and
> use ice/hot water modalities.

Id. Plaintiff reported that he "[i]s never comfortable sitting," "[i]s able to stand approximately 30 minutes, this with movement," "[i]s able to walk approximately 20–25 minutes with a cane," but "[h]ills, inclines, [and] hard surfaces are difficult for him," and that turning, twisting, lifting, carrying, stooping, squatting, and reaching are all difficult because of pain. Id. Plaintiff further advised that he was unable to perform even "light[]" work activity "because of his pain, reduced concentration/attention and use of lower extremity which increase[s] his pain." R. 336. Plaintiff said that "he experiences 'good' and 'bad' days, 1–2, 5–6, respectively and this on an irregular basis," but even on his "good" days, "he is unable to sustain activity . . . eight hours per day[.]" Id.

7

Throughout the examination, Dr. Hecker observed the following manifestations of pain behavior: "[c]ane utilized for ambulation," "[d]ifficulty ascending and descending steps," "[c]hange of position frequently because of pain," and "[r]ecline in chair during entire interview." R. 334. Based on his review of Plaintiff's medical records and his independent examination, Dr. Hecker opined that Plaintiff "is unable to perform any substantial gainful work activity existing in significant numbers in open competition with others." R. 337. In support, he noted that Plaintiff had undergone "treatment for his injuries taking the form of evaluative and surgical procedures, pain medications, muscle relaxants, ESI's, physical therapy and other conservative measures—all with no significant improvement in his physical functioning or substantial reduction of his chronic moderate to moderately severe pain." Id.

Around the same time that Dr. Hecker conducted his examination, J. Samuel Seastrunk also reviewed Plaintiff's medical records and conducted an independent physical examination at the request of Plaintiff's attorney. In his report, Dr. Seastrunk wrote that Plaintiff reported "occasional tingling involving his hands" and "low back pain which he measures as 5/10[] most of the time and he occasionally has pain going down his legs." R. 314. Plaintiff further advised Dr. Seastrunk that:

> [H]e has pain with all daily functions, has difficulty getting dressed and walking, sitting or standing. He relates that he is unemployed and "cannot work." He relates that he is unable to fish, hunt, golf or play with his son. His relationship with others is limited because of chronic pain involving his neck and low back.

Id. Plaintiff advised Dr. Seastrunk that he takes hydrocodone once a week and ibuprofen two to three times per week, but "he tries to guard against becoming addicted." Id.

Dr. Seastrunk personally observed that,

> When I walked into the examining room, [Plaintiff] was standing up and when he sat down, he had constant motion changing positions and finally he was told that he

8

could stand up, walk around or sit, whichever met his fashion and he did this throughout the examination. Basically he seemed very uncomfortable.

R. 317. Based on his review of Plaintiff's medical records as well as his own examination, Dr. Seastrunk concluded:

> I am in agreement with his treating surgeon in that this gentleman will need chronic pain management on a long term basis and he will be markedly restricted relative to his work activities in the future and will not be able to do the type of work that he is accustomed to doing and, in my opinion, his pain will interfere with normal work pace 8 hours a day, 5 days a week and will create interruptions of work and unpredictable periods of breaks. This should include all types of work including sedentary work. Also the claimant's pain in terms of an 8 hour work day would interfere with sustained concentration and work pace. Additionally, he will not be able to climb ladders, stairs, or perform bending, stooping, squatting, pushing and pulling or using hands and feet to operate machine controls. Standing and walking should be two hours maximum during an 8 hour work day and the claimant would need to change positions frequently in order to sit this amount of time.

R. 318. Referring to the Fifth Edition of the AMA Guides to Permanent Impairment, Dr. Seastrunk concluded that Plaintiff "has a 22% whole person impairment as it relates to the spine relative to the injury which occurred 9-22-06 and 26% impairment to the spine." Id.

The next medical documentation in the record is from October 27, 2008, when Plaintiff was seen at Cork Medical Center in Marshall, Illinois for complaints of back pain. R. 347. At that visit, Plaintiff reported that he had suffered back pain since the September 2006 accident and that "he was given meds last year but the meds made him feel funny and . . . they did not help his pain." Id. As a result, he had not seen a doctor or taken any medications for over one year. Id. He reported that with the cold weather, the "pain has become unbearable again." Id. Notes from the subsequent examination report that Plaintiff appeared to be in severe pain, walked and stood with a cane, and was unable to sit for any extended period of time. R. 349. Plaintiff was prescribed Vicodin, diazepam, and fentanyl for pain and muscle spasms. Id. The provider concluded that, for Plaintiff's

9

chronic back pain he "will need chronic pain medications." Id.

Plaintiff returned to Cork Medical Center on October 31, 2008, where he reported that "the medication did control his pain but it makes him feel very 'fuzzy.'" R. 350. He was taken off of fentanyl and put onto cymbalta instead "for neuropathic pain." R. 351. Plaintiff had another follow up visit scheduled for November 10, 2008, but he canceled it, advising that the new medication "is helping him and he is feeling better." R. 352. The final medical documentation provided in the record is a note that, on January 9, 2009, Plaintiff's wife called the same medical provider requesting a refill of "celebrix." R. 353.

**B.    Hearing Testimony**

At the hearing held before the ALJ on April 29, 2009, Plaintiff was represented by Jack Leder. Plaintiff testified that the September 2006 motor vehicle accident caused "some bulged discs in my neck and some damage to discs in my lower back." R. 46. He testified that he underwent two surgical procedures: a plasma disc decompression and a micro discectomy. The disc decompression procedure was somewhat successful: before he had the procedure he "was very contorted to the right side," but afterward he was able "to stand more straight up[.]" Id. Neither procedure, however, "solved" his problems. R. 46–47. He testified that he still has "pretty constant pain . . . running down my right leg from my lower back and inability to sit and stand for long periods of time." R. 47. Plaintiff also testified that he has been given trigger point injections or epidural steroid injections, but these did not solve his pain problems and "were very painful as well." R. 50. When asked what it is that prevents him from being able to work, Plaintiff responded,

> Well, I've got a problem with my lower back is [sic] my primary pain. I've got a
> nerve that's damaged which limits the use of my right leg is why I use a cane because
> sometimes my leg gives out. I've got some stiffness in my neck from the bulged

> discs in my neck, numbness in my hands.  It stays there pretty constantly . . . [in] both hands.  And I just I really I have no strength.

R. 45–46.  Plaintiff further testified that, since his surgery, he has walked with a cane "constantly."

R. 48.  He said that the only time that he sets the cane down is when he is in the house where there

is furniture or something similar that he can lean against.  R. 48–49.  Plaintiff testified that he is in

"constant" pain, which in turn affects his ability to concentrate and to sleep.  R. 49.  He testified that

he believes that, nightly, he only sleeps consecutively for periods of under an hour at a time.  He

explained: "I may sleep at night but it's very broken up.  I wake up and have to reposition from the

pain."  Id.  Plaintiff further testified that "[w]eather sometimes can play a big factor in my pain

levels, different fronts moving in . . . very overcast and rainy days seem to be primarily my worst

days."  R. 50.  On average, Plaintiff rated his pain as a seven on a scale of one to ten.  Id.  With

regard to pain management, Plaintiff testified that he takes hydrocodone and ibuprofen "on a regular

basis" and "I also have a muscle relaxer and a nerve pain medication."  Id.  When the ALJ asked

whether Plaintiff was "getting any treatment from a pain management specialist," Plaintiff

responded, "I got a treatment from a pain specialist, they medicated me and  . . . injected me and

tried numerous different things with me and it always intensified my pain."  R. 50–51.  Plaintiff

advised that it had been "over a year" since he had last seen a pain management specialist, explaining

that he believed that "they did a lot more harm to me it seemed than I know."  R. 51.

　　　　Plaintiff testified that, in his current condition, he is usually only able to sit in a chair for "less

than 20 minutes depending on how much I squirm."  R. 45. When asked how long he can stand,

Plaintiff replied, "About the same."  Id.  When asked how far he can walk, Plaintiff responded, "If

I had to just walk through the course of a day maybe half a mile if I had to."  He estimated that he

could walk "[m]aybe the distance of two blocks" in one continuous stretch of time.  Id.  Plaintiff

further testified that he could lift "[w]ithout some excruciating pain probably some—maybe about

20 pound[s]."  Id.  He estimated that his son weighs forty pounds and advised that he is not able to

lift him: "if I have to pick up my son, I usually sit down and kind of drag him up on my lap."  R. 53.

He testified that, due to pain, he is unable to do any bending, twisting, or squatting.  R. 54.  When

asked if going up or down stairs is "a problem," he replied, "Stairs are difficult."  Id.

Plaintiff testified that, prior to the accident, his work entailed building custom homes with

his father for twelve or thirteen years, doing "[e]verything from carpentry to running heavy

equipment."  R. 47.  Before the accident, he "did a lot of work" and "did some hunting and fishing

as hobbies on a pretty regular basis," but since the accident he has not worked and he no longer does

any of these other activities.  R. 47–48, 52.  Plaintiff lives in a house with his wife and his minor

child.  R. 52.  Plaintiff does not do any cooking, cleaning, vacuuming, shopping, or yard work.  R.

52–53.  His father lives nearby and comes over to cut the grass.  R. 52.  His wife pays the monthly

bills.  R. 53.  Plaintiff testified that,

> I've tried to do some things around the house just to help my wife but it seems that
> it just takes me so long and it takes so much out of me and so much time to just
> recover.  You know, if I help dust or something like that, I usually pay for it
> immensely and . . . it's not worth the effort to try and put myself out with that
> situation.

R. 52.  When asked if he has any problem grooming himself or bathing or showering, Plaintiff

responded that, "Everything seems to be a task but I . . . don't get any assistance with that.  I try and

take care of myself."  R. 53.  Plaintiff testified that he was actively involved in church before the

accident, but he no longer attends regularly "because of my pain levels."  Id.  Plaintiff does, however,

occasionally visit with "a couple neighbors that live close by."  Id.

12

The only other witness to testify at the hearing before the ALJ was a vocational expert (the "VE"). The ALJ posed the following hypothetical question to the VE:

> Assume we have a hypothetical person whose age range is from 31 to 33, who has a 12th grade education, who can sit for 30 minutes, stand for 15 alternating throughout the day, walk two blocks, lift 20 pounds. Change that from [sic] sit for one hour, stand for 15 minutes alternating throughout the day, limited to occasional climbing—let me revise this one, too. I had it written down. I want to revise it. Limited to occasional balancing, stooping, kneeling, crouching, and crawling, and climbing of steps and ramps. No climbing of ladders, scaffolds, and ropes.

R. 56. The VE testified that, based on this hypothetical, such a person would be capable of performing sedentary work, including the jobs of food and beverage order clerk (the VE stated that approximately 400 positions in South Carolina and North Carolina each had been identified for this job), credit clerk (approximately 500 positions in South Carolina and North Carolina each identified), and production inspecting, such as a nut sorter in the snack food industry (approximately 340 positions identified in South Carolina and 480 in North Carolina). R. 57.

When Plaintiff's counsel asked the VE whether her opinion would change if the hypothetical person suffered numbness in both hands, the VE said that she could not answer that with any certainty because "numbness is often fleeting" and "it may not be constant[.]" R. 58–59. Next, Plaintiff's counsel asked, "If you add the additional facts to the hypothetical of necessity to take breaks in excess of a normal two breaks and a lunch hour on a job, would that affect your opinion as to these positions you've stated for the Judge?" The VE responded in the affirmative, explaining that, "In these positions where a certain amount of work is expected during the day or a person has to be responsive to phone calls or to customers, then more than ordinary breaks would probably not be tolerated very long." R. 59. Plaintiff's counsel continued, "And . . . if there was a necessity to elevate or recline periodically during the eight-hour shift, would that affect your opinion?" The VE

responded, "It would only be possible at breaks," reiterating that the normal number of breaks permitted during an eight-hour shift in the types of jobs identified was three per day, including lunch. Id.  When Plaintiff's counsel asked, "[I]f the hypothetical included the ability to only sit for two hours maximum during an eight-hour workday and also change positions frequently, would that affect your opinion?" the VE responded, "I don't think the jobs could be done under that additional hypothetical."  R. 60.

The ALJ then asked Plaintiff a few more questions, focusing on Plaintiff's decision to cancel his appointment at Cork Medical Center for a follow-up appointment on November 10, 2008. Plaintiff explained that he "went through a really bad time period where I could not function at all and I was actually given morphine to self-administer at home."  R. 61.  The morphine, however, was too strong for Plaintiff, so he went back to the doctor to try to find something else to address the pain.  As per the records summarized above, Plaintiff was given a different prescription and after that he canceled his next appointment, because "I was no longer confined to a bed and I told the doctor that I was better being that I was not confined to a bed any longer."  Id.

## C.    ALJ's Decision

The ALJ made the following findings in his decision denying benefits:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.    The claimant has not engaged in substantial gainful activity since September 22, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairment: residual neck, back and leg pain from injuries sustained in motor vehicle accident resulting in a plasma disc compression in December 2006 and a lumbar microdiskectomy in February 2007 (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) limited to one hour sitting, 15 minutes standing - alternating throughout the day; walking two blocks; lifting 20 pounds; and occasional climbing, balancing, stooping, kneeling, crouching and crawling with no climbing of ladders, scaffolds or ropes.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on April 13, 1975 and was 31 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date.  (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 22, 2006 through the date of this decision (20 CFR 404.1520(g)).

R. 11–17.

The ALJ's decision noted that, in making his finding, he had considered all of Plaintiff's symptoms to the extent they could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR 404.1529 and 404.1527 and

Social Security Rulings 96-2p, 96-4p, 96-5p, 96-6p, 96-7p, and 06-3p.  R. 11.  After considering Plaintiff's testimony and the medical records provided, the ALJ found that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functioning test."  R. 14.[1]

The ALJ further concluded that,

> The record does show that the claimant has limitations due to [injuries suffered in the accident], however, not to the extent or degree alleged.  The records show that the claimant went for a long period of time, approximately one year, without seeking medical attention, and it is reasonable to assume that the claimant's pain was at a bearable level.  Further, the record shows that the claimant takes little medication for his pain, stating that he took one narcotic pill a week and over-the-counter pain medication once or twice a week.  Additionally, when he was seen in September 2008, a year after the last medical visit, the doctor noted that most of his pills were still in the bottles.  This behavior is not consistent with constant debilitating pain.

Id.  In addition, the ALJ found that "there is a conflict between the testimony and the medical records" as it relates to Plaintiff's "daily activities."  Id.  Specifically, "[t]he claimant testified that he did no housework, yard work, and seldom left the house.  However, he reported to various physicians and evaluators that he at least occasionally drove, went shopping, and attended church." Id.  Finally, the ALJ wrote, "[t]here is also the question of secondary gain to be dealt with," referring to the fact that "[t]he claimant has been sent for vocational evaluations during which he exhibited extreme pain behaviors; however, the record mentions that the claimant is involved in a workers compensation claim."  Id.

The ALJ acknowledged that Dr. Gudeman, Dr. Seastrunk, and Dr. Hecker all opined that

---

[1]    The decision did not specifically identify the referenced inconsistencies between Plaintiff's testimony and the results of the residual functioning test.

Plaintiff is unable to do sedentary work or sustained activity due to pain, but gave "little weight" to these opinions for the following reasons. First, the ALJ noted that Dr. Gudeman issued his opinion in June 2007. As such, it "was rendered only about nine months after the accident and would not necessarily continue for the twelve continuous month period required by the regulations." R. 15. Although Dr. Seastrunk and Dr. Hecker issued similar opinions in or around September 2007, the ALJ discounted these as well, noting that "these opinions were made after reviewing Dr. Gudeman's records and could reflect some influence by Dr. Gudeman's opinion." Id. The ALJ further found that "these doctor's statements provide no explanation as to how and why the claimant's neck, back and leg pain, which the claimant indicates is occasional, only of a moderate level, and that he does not feel the need to take pain medications on a regular basis to relieve, result in full disability." Id. The ALJ noted again that, "the claimant was off all pain medications from September 2007 until October 2008 when he reported that the pain became unbearable due to cold weather after the claimant moved to Illinois . . . . once the claimant was back on medication, he reported feeling much better." Id.

The ALJ, instead, gave "substantial weight" to the findings issued by "State agency medical consultants." Id. Based on the opinions of these non-examining physicians, considered in concert with other evidence in the record, the ALJ found that,

> the claimant is able to perform a limited range of "sedentary" work with one hour
> sitting, 15 minutes standing—alternating throughout the day; walking two blocks;
> lifting 20 pounds; and occasional climbing, balancing[,] stooping, kneeling,
> crouching and crawling with no climbing of ladders, scaffolds or ropes.

Id. Although the ALJ found that Plaintiff's limitations meant that he was unable to perform any past relevant work, the ALJ concluded that Plaintiff would be able to perform sedentary work of the sort

17

identified by the VE, including food and beverage order clerk, product inspector, and inspecting nut sorter in the snack food industry.  R. 16.

### III.  STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Act is a limited one.  Section 205(g) of the Act provides that "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance."  Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964).  This standard precludes a de novo review of the factual circumstances that substitutes the Court's findings for those of the Commissioner.  Vitek v. Finch, 438 F.2d 1157, 1157 (4th Cir. 1971).  The Court must uphold the Commissioner's decision as long as it is supported by substantial evidence.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

"From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted.  The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action."  Flack v. Cohen, 413 F.2d 278, 279 (4th Cir. 1969).  "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the [Commissioner's] findings, and that his conclusion is rational."  Vitek, 438 F.2d at 1157–58.  The Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.  THE APPLICABLE LAW AND REGULATIONS

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a)(1).  Disability is defined as: "[the] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act has, by regulation, reduced the statutory definition of "disability" to a series of five sequential questions that are to be asked during the course of a disability determination.  The five questions are: (1) is the claimant engaged in substantial gainful activity; (2) does the claimant have a severe impairment or combination of impairments; (3) does the claimant have an impairment that meets or equals one of the listings in the appropriate appendix; (4) is the claimant prevented by the impairment or combination of impairments suffered from engaging in his or her relevant past employment; and (5) does the claimant have the ability to engage in other gainful activity considering his or her age, education, past relevant experience, and residual functional capacity.  See 20 C.F.R. § 404.1520.  An individual may be determined not disabled at any step if found to be: gainfully employed, not severely impaired, not impaired under the Listing of Impairments, or capable of returning to former work.  In such a case, no further inquiry is necessary.

## V.  DISCUSSION

Plaintiff objects to the ALJ's failure to give the opinions of Plaintiff's treating physicians controlling weight.[2]  Under the governing regulations, "[i]f . . . a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable

---

[2]     Because this case is being remanded, the Court does not reach Plaintiff's objections with regard to the ALJ's credibility determination.

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record," the ALJ should give the opinion controlling weight. 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2). "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996) (internal citations omitted) (alterations and emphasis in original quotation). However, even if a determination is made that a treating physician's opinion is not "well supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in the record," it does not necessarily follow that the opinion should be entirely discounted. Such "[t]reating source medical opinions are still entitled to deference and must be weighed using all the factors provided in 20 C.F.R. 404.1527 and 416.927." SSR 96-2p, 1996 WL 374188 at *4. Thus, an ALJ who determines that a treating physician's opinion is not entitled to controlling weight should then consider the weight to be given to the opinion by applying the following five factors set forth in the referenced regulations: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d). Indeed, "[i]n many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188 at *4. But, in any event,

> the notice of the determination or decision [of a DIB claim] must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any

20

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Id., 1996 WL 374188 at *5; see also 20 CFR §§ 404.1527, 416.927.

In determining that the opinions of Plaintiffs' treating physicians should be accorded "little weight," the ALJ failed to apply the five factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  With regard to Dr. Gudeman, who began treating Plaintiff shortly after the September 2006 accident, the ALJ appeared to find that Dr. Gudeman's opinion should not be accorded "controlling weight," because the ALJ believed it was inconsistent with Plaintiff's later approach to pain management, i.e., "inconsistent with . . . other substantial evidence in the record." 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2).[3]  However, as explained above, even where an ALJ decides that a treating physician's opinion warrants less than controlling weight, the ALJ must still consider the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) in determining how much weight to give the opinion.  See SSR 96-2p, 1996 WL 374188 at *4.  One of those factors directs the ALJ to consider the evidence upon which the treating physician's opinion is based.  In the case of Dr. Gudeman, his opinion expressly relied upon prior attempts to manage Plaintiff's pain with epidural steroid injections and medication, two surgeries, follow-up examinations, the failure of Plaintiff's treatment through physical therapy, and the independently-performed functional capacity testing.

---

[3]    The other basis stated by the ALJ for rejecting Dr. Gudeman's opinion was that it was issued only nine months after the accident.  While the date of an opinion may properly be part of the ALJ's analysis, the court notes that crediting an opinion issued nine months after the accident is not inherently inconsistent with the Act's definition of disability, which requires that the claimant be found unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A) (emphasis added).

See R. 284.  The ALJ did not explain why he concluded that, despite this evidentiary basis, Dr. Gudeman's opinion was entitled to such little weight.  Furthermore, because the ALJ's analysis of the weight to be given Dr. Gudeman's opinion was insufficient, his determination that the opinions of Dr. Seastrunk and Dr. Hecker should also be discounted, largely because they were issued after reviewing Dr. Gudeman's records and, therefore, "could reflect some influence by Dr. Gudeman's opinion," is similarly flawed.  Finally, the ALJ's determination that the opinions of Plaintiff's treating physicians are "inconsistent with other substantial evidence" in the record—namely, Plaintiff's decision to forego pain medication for a year—fails to explicitly address Plaintiff's testimony that he discontinued taking the medication because it was not relieving his symptoms and he was suffering significant side effects.

## VI.  CONCLUSION

After a thorough review of the Report and Recommendation and the record in this case and for the reasons set forth above, the Court hereby ORDERS that the Commissioner's decision be REVERSED and the case be REMANDED for further administrative proceedings not inconsistent with this order.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
Margaret B. Seymour
United States District Judge

August 26, 2011
Columbia, South Carolina

22